Morning. May it please the Court. My name is Stephen Sugarman. I'm here this morning on behalf of Plaintiff Appellant Forest Conservation Council, which I'll refer to as FCC in my argument this morning. At council table with me is Mr. John Talbert, the Executive Director of Forest Conservation Council. An issue in this appeal is the process that the United States Forest Service used to authorize the largest commercial timber sale that has been authorized in the southwestern United States in at least the last 15 years. That's a timber sale of approximately 25 million board feet on 24,700 acres of national forest land in Arizona. This is a salvage timber sale, a post-fire timber sale, and the areas that will be logged pursuant to the decision are the areas that were burned at a moderate or severe intensity in the Rodeo Chedesky Fire in the summer of 2002. The areas within the Rodeo Chedesky Fire perimeter that were lightly burned or unburned will not be treated or logged in connection with this project. Now, the Forest Service has conceded in the administrative record and the district court has determined on remand from this court that there is no imminent risk of fire in the project area where the timber sale will occur. That's because, as I just stated, the timber sale will only occur in those lands that were moderately or severely burned and in those areas there are no combustible ground fuels that would allow a fire to combust and to spread. Importantly, the Forest Service also concedes that post-fire logging projects like this one are controversial and associated with a number of adverse effects on soils, watershed, and wildlife. And the Forest Service also concedes that the adverse effects of post-fire logging generally outweigh any positive ecological benefit that is associated with post-fire logging operations. Let me ask you about two things. One, or maybe more than two, one, the logs that are being harvested are burned, right? That's correct, Your Honor. They're not standing living trees? The timber sale plans, Your Honor, call for only the removal of trees that are dead or that will inevitably die, not survive the fire. Of course, it's a concern to my client that the way that the timber sale has been cruised and is being implemented may allow for the removal of live trees. But, yes, the plans call only for the removal of dead or dying trees. The district court seemed to rely upon, in that connection, two facts. One was that the Forest Service did not have the funding to simply remove these trees at its own, on its own cost, out of its own budget, right? That's correct. That seemed to be the district court's principle basis for denial of injunction. Therefore, the only, in the Forest Service view, the only way to remove these trees was to contract out and get value for them, right? That's correct, Your Honor. To have private companies come in and harvest the burned out or dead trees for commercial purposes. Yes. So all of that's correct so far? That is correct, Your Honor. And the final thing is that over a period of time, and I think the figure 18 months was used, the value of that for commercial purposes dissipates. That has been the Forest Service's claim, but in that regard, Your Honor, I think it's important to realize. Didn't the district court specifically rely upon that fact, that last fact? Well, I think what the court bear in mind is that the project that we're dealing with today is a project of the commercial timber sale that we're dealing with is 24,700 acres. The larger project that was authorized at the time that the commercial timber sale was authorized is a project of more than 37,000 acres, almost 38,000 acres. The portion of it that your side won below, right? Well, that's not the point that I'm making. The project authorizes actually 14,000 acres of noncommercial work, watershed and soil rehabilitation and restoration. That aspect of the project almost certainly will not be implemented because it will require $6 million in government funds that haven't been made available. It was, of course, our contention that, you know, while that work would be nice, it was authorized primarily as window dressing. Judge Hawkins, what's particularly important here insofar as Judge Martone's findings in this regard are concerned is that the commercial timber sale aspect of this project, the 24,700 acres that were authorized, will really not do anything to appreciably reduce any of the hazardous fuels that we'll appreciate in the timber sale area over the next one or two decades, 10 to 20 years, for a couple of reasons. First of all, as I believe that our briefs make clear, with this timber sale, the timber sale operators will be removing only approximately 10 percent of the dead and dying trees, and those are the 10 percent of the trees that are larger than 12 inches in diameter. All of the remaining trees, the trees that are smaller than 12 inches in diameter, which are the trees that are most likely to fall quickly and most likely to become a future fire load, will remain in the fire area, in the project area, after the timber sale is complete. Why? Because the removal of those trees isn't profitable. So the Forest Service has offered private industry the opportunity to come into this area where the fire occurred and essentially to cherry pick only those trees which have a high economic value. Well, we're not here about whether the Forest Service's ultimate goal or their methodology makes sense in a perfect world. We're here because you contend that they should have done an environmental impact study of some kind before being allowed to pursue these contracts, right? That's the context of the appeal. These issues that we're talking about, I believe, go to the relief, and this is where Judge Martone got to these issues. Judge Martone was explaining that he did not grant injunctive relief, even though he found a NEPA violation in connection with the Wildland Urban Interface Project, because it would be more economical for the government in the long run to allow private industry to remove these 10 percent of the trees at this time. You're now talking about the Wildlife Urban Interface? The Wildland Urban Interface. But the Forest Service doesn't appeal that, right? The Forest Service had appealed that, but they have dropped their appeal. They're not appealing that, right? They're not appealing that right now. And in the interim, they've done an NIS on that segment? No, that's not correct, Your Honor. In the interim, they have prepared an EA on that segment. Your Honor, also, isn't the issue whether an EA or NIS is more appropriate before us? No, it's not, Your Honor. The Forest Service is alleging that the post-decisional EA that was prepared on Judge Martone's order satisfies whatever NEPA concerns my client might have had at the time that it initiated this lawsuit. But that cannot be the case. This Court has held time and time again that proper timing is one of NEPA's central themes. Here we have a case where, in connection with the WUE project, the Wildland Urban Interface Project, the ‑‑ I love these acronyms. I'm sorry. The Forest Service went back to prepare an environmental assessment on a project that had already been authorized, that was already under contract, and that was already under implementation. What were they supposed to do? What they were supposed ‑‑ what do I feel was the appropriate relief? I mean, they made their argument to the district court that it was categorically exempt. They lost. Uh-huh. They went out and did their EA and proceeded. What should have happened in that case is the project should have been enjoined pending compliance with NEPA. Has that now been carried out? Has that phase been carried out? The project is being carried out as we speak. The project is being implemented pursuant to four timber sale contracts, and each of the four contracts includes within the scope of the work authorized by the contract portions of each of the three component parts of the project, portions that were authorized under the Roads and Trails Memorandum, portions under the Fences and Utility Line Memorandum, and portions under the WUE Memorandum. My question is, as to the WUE, is that contract complete? No, it is not complete. But it's ongoing because it was not enjoined? It's ongoing because it was not enjoined. Your Honor, also in line with your question, I think that it's important to note that this Court as well as other courts have recognized that NEPA contemplates a delay and that oftentimes that delay will be associated with increased costs to the government. If the government could defend against a NEPA claim by arguing, well, jeez, if we comply with NEPA in this case, it's going to result in an increased cost to the government. The cost of money will go up. We're losing some opportunity right here that we have to minimize a cost. We have a private partner right now who is willing to shoulder some of the burden. Then the process of NEPA will be entirely sufficient. It's not just monetary cost. The question is you're really weighing environmental costs versus environmental costs because if you don't clear some of this timber, you are likely to get worse fires in the future, which would itself have more than monetary impact. It would have environmental impact. It would have habitat impact. So it's not a situation where you say, well, there's a question of money and just delay. Delay here could mean another disaster. That's incorrect, Your Honor. As the Forest Service concedes throughout the administrative record, this project, implementation of the timber sale project at this case, will actually increase the risk of fire in the project area and not decrease the risk of fire in the project area. Where do they concede this? Pardon me? In the administrative record. The Forest Service has not conceded that point. That's because what's happening – I'm sorry. I just told this at hand. The Forest Service, I'm sorry, has conceded that point. They do not dispute that point. The Forest Service concedes that implementation – let me say this again so that I'm clear. The Forest Service concedes that implementation of this project will result in an elevated risk of fire in the project area. That's because what's happening – and that's generally true of post-fire timber sales. That's particularly true of this post-fire timber sale, because this case is very unusual in that the Forest Service has authorized the timber sale operators to conduct the timber sale operations without requiring the operators to treat any of the slash, which is the debris that's created by the logging operation. In this case, the timber sale operators are being allowed to leave that slash on the ground. And at some point in the future, if Congress appropriates sufficient funds to the Forest Service, then the public will go up and clean up the mess that was created by the timber sale operators. But, Judge Kaczynski, in the short term, this project – all of that, you know, over time disintegrates. You know, the insects come in. The microbes come in. It's part of the recycling of the forest. Your Honor, it – So why does that pose an additional fire hazard? It doesn't – what happens is, is that at the status quo, the fires in Arizona, as I'm sure – and throughout the western United States are heavily overstocked because of various management decisions that have been made over the course of the last eight decades. But you are absolutely correct, Judge Pragerson, the Forest Service's last official word on this topic as an institution was made in 2000, when they issued a report which was specifically dealt with the environmental effects of post-fire logging and really whether there was any ecological or public safety utility to coming into a fire area and conducting logging shortly after the fire. And what the Forest Service has determined is that it's more than likely that the ecological – the negative effects outweigh any potential ecological benefit. It goes without saying that it's good for industry to be able to come in to a timber sale area and high-grade, as they're doing in this case. But insofar as public safety is concerned and insofar as ecology is concerned, this sale is doing nothing to promote either. I'm sorry. I mean, you keep saying that the Forest Service – the government sees all this, but I remember clearly that the brief argues that removing these trees will involve, you know, from closer trails where they might fall and injure somebody or might block trails or, in fact, has a positive safety concern. Your Honor, you're correct, but those are two different issues. The one issue is whether this project actually will do anything to abate the accumulation of hazardous fuels. I think that it's clear that this project will elevate the short-term risk of fire and not decrease it. The issue that you're talking about, Your Honor, is a different issue. That's the public safety justification that the Forest Service has offered. Maybe I understood what you just said, but I thought you just said that they've conceded that there's no public safety justification. No. If I said that, I misspoke. The Forest Service's main argument right now with respect to why this project ought to be allowed to proceed and why it's important that it proceed quickly is an argument that it's important for what the Forest Service calls hazard trees to be removed from the project area so that they don't fall on roads, trails, fences or recreation sites. But, Your Honor, I would submit that even that justification for this project won't save the Forest Service here for a couple of reasons. First of all, even without this commercial timber sale, the Forest Service has authority under and here's another acronym, Judge Hawkins, BEAR authority, B-A-E-R, Burned Area Emergency Restoration. The Forest Service has the authority to remove hazard trees along roads and trails and around recreation sites. And, indeed, at the time that these decisions were entered, the Forest Service had already removed the hazard trees along 302 miles of roads in the project area. There doesn't need to be a commercial timber sale to remove hazard trees. And, in fact, because this is a commercial timber sale, it doesn't even look like a hazard tree removal project. The Forest Service routinely implements hazard tree removal projects. I'm not sure I understand what difference it makes. If the Forest Service has authority to do it itself, why doesn't it have authority to have it done commercially? Because the Forest Service would not have the authority. The Forest Service has the BEAR authority to remove hazard trees. What the Forest Service does not have is the authority to allow a commercial timber sale whose primary purpose is to allow private industry to capture economic benefit of trees in a way that can be, through some semantic somersault, be denoted or characterized as a hazard tree removal project when, in fact, it is not a hazard tree removal project. In this case, a hazard tree removal project, you're going along a trail. There's a tree there that's sick or dying, and there's a chance that it may fall on the path. So they put a yellow ribbon around it or whatever they do, and they come and cut it down. That's correct. And they leave it there. They leave it there, don't they? They could leave it there. I see. They leave them there. Or they could be removed, either way. Yeah. Well, you know, they clear the path. They leave the trees there. Then the tree, you know, then the nature comes in and everything else, and the cycle continues. But consider this, Your Honor. This, for instance, roads. The buffer that the Forest Service has created along roads for the so-called hazard tree removal is far in excess of any buffer that the Forest Service has used in the past. In the past, what the Forest Service does is it makes an individualized determination, as Judge Kragerson suggests, as to whether a tree actually poses a risk of falling on a target. That means that the tree, when it falls, will hit a target and cause injury to property or to people. Here, a tree that might be 50 feet high can be removed as part of this commercial timber sale, even if it has no possibility at all of falling on a target. And conversely, if a tree is 10 inches in diameter but is immediately adjacent to the road, it will be left by the timber sale operators because it's not profitable to remove that tree. So really it's very cynical of the Forest Service to characterize this as a hazard tree removal project. Trees that pose no risk of injury are being removed because they're economically valuable. Trees that might legitimately pose a hazard to motorists or to hikers are being left right by the side of the road or right by the trail. What lessons did we learn after the big fire at, oh boy, where Old Faithful is? The Yellowstone fire. What we've learned is that, and it's a lesson that the Forest Service has learned, I believe, is that, in fact, that we have mismanaged the forests over the last 80 years. Because the Forest Service has largely been concerned with protecting the timber resource for the benefit of the timber industry and because of the large amount of grazing that the Forest Service conducts, the forests throughout the West are in a somewhat unhealthy condition. And when fires do occur, fires can be very large and very hot. Again, that's not the case right now in the Rodeo Chedesca fire area, especially the moderate and severely burned areas where this project is. There's a big controversy about whether to, you know, clear these trees and cut them down or just leave them standing. Well, the big controversy right now, the way this is all panning out, Judge Pragerson, is the Forest Service. I mean, after Yellowstone. The Forest Service has learned that fire is healthy. For many, many decades, fires have been suppressed across the landscape because they were thought to be bad for economic resources. The lessons that we've now learned is that fire is an ecologically beneficial component of what happens over time. In fact, in an area like this, the Forest Service has already determined that this fire actually, despite the fact that it was a tragedy for some people who might have lost their homes, that fires like this actually have a very important role in ecology and that they're beneficial to wildlife. And the Forest Service right now is readjusting so that it doesn't automatically suppress every forest fire that comes along. The forest fires, if they are allowed to burn periodically, they burn at a much lower intensity. They tend to not the flame length is much lower and much, much, and the fires end up being much smaller. You're over your time. Thank you, Judge. Okay. May it please the Court, good morning. My name is John Smeltzer for the Forest Service. Your Honors, I'll be sharing my time this morning with Julie Weiss for the interveners. I have promised her at least eight minutes, and I'll do my best to keep to that schedule. Why don't you begin by addressing your opponent's argument that the Forest Service conceded that these activities elevated the risk of future fire? The Forest Service conceded that there is a slight increase, and this is in the declaration of I think Elaine Zeroth that was submitted with respect to some of the injunction issues, the stay requests. We conceded there is a slight increase of fire in the immediate aftermath of the cutting of the timber related to the remaining slash, but that had to be viewed in the context of the fact that that cutting was ongoing in areas where the fire risk, the immediate short-term fire risk was very low because these are areas that have been severely or moderately burned by fire. And so we're talking about a temporary short-term increase in fire risk that's inevitable when the slash is there. The other thing that Mr. Sugarman suggested is that we're not coming in and doing the slash removal or the other aspects of these projects, and I submit that the record doesn't demonstrate that. There are indications in, again, the materials that were presented with respect to the stay issues that the Forest Service is coming in behind the operations that are ongoing and doing the slash treatment, and the slash treatment, although not being required of the operators themselves, is a required part of these decision memos that were approved. So that is a group effort there, and it's being done. Your Honor, this case involves three projects, three separate projects. One was a fuels reduction project for the wildland urban interface. The other two projects involve hazard tree removal to protect roads, trails, fences, utility lines, et cetera. The district court, of course, ruled against us with respect to the wildland urban interface project, and where I'd like to start this morning is with the questions of mootness that we have raised with respect to that project and then come back to the issues about the use of categorical exclusions for the other two projects that remain before this court. Your Honor, when an agency determines or when an agency, a court determines that an agency has improperly relied on a categorical exclusion, there are two forms of relief the court might grant. First, the court can tell the agency, go back and do the NEPA analysis that's required. Secondly, the court can enjoin operations pending that NEPA analysis. Here, what happened with respect to the wildland urban interface is that the district court ordered the Forest Service to go back and do the NEPA work. Why break this down into three different projects? Your Honor? What was the point in doing that? There were three different justifications. As I stated from the outset, the ---- You could take that for any project. You can take that for any project and break it down into little pieces. You have to look at the project as a whole, don't you? Well, there are rules under NEPA by which an agency must exercise its discretion in determining whether a project is to be treated as one project, two projects, or three, and I intend to address that here. What is the rule on that? Well, the specific rule that the Forest Conservation Council cites is 40 CFR section 1508.25, which is the rule that addresses when actions should be, when multiple actions should be considered in a same environmental impact statement, and that rule tends to guide the earlier stages of the process, both at the categorical exclusion stage and at the environmental assessment stage. The plaintiffs address that in their brief at pages three through eight, and we submit, Your Honor, that they address it inappropriately or incorrectly. There are really three different types of actions that that regulation addresses. One is similar actions, and the plaintiffs suggest that any time you have a similar action that the rule says you have to consider them together. The rule doesn't. What the rule says with respect to similar actions is that the agency has discretion to consider them together if it's expedient. So we would concede that these three projects have similar aspects to them, but the rule doesn't say a similar action, similar actions have to be considered together. The second thing the rule addresses is something known as a connected action, and there what is really at issue is the case of actions where one action is not independent of the other, and the test that's typically applied in that circumstance is a test of independent utility. And what we argue here is that these projects did plainly have independent utility. It's important to cut down the hazard trees, to remove those hazard trees that affect the trails, to protect the public that are going to use the trails, and that's a completely separate justification than doing the wildland urban interface removal, which is designed for fuels reduction. There's nothing that says you can't have the safety benefits of the one without doing the two together. So they're really not connected actions in that sense that the rule's reaching at. So the final thing, the only thing that's potentially relevant is the issue of cumulative effects, and what the rule essentially says is that if there will be cumulatively significant effects, then they're to be considered in a single environmental impact statement. But what we submit here is that while there may be cumulative or combined effects, there's not cumulatively significant effects, so there weren't cumulatively significant effects to the extent that precluded the reliance on the categorical exclusions. But what I want to do is go back to and address this question of mootness with respect to the wildland urban interface project. Before you get to that, the road removal segment allowed removal of trees 500 feet on either side of the road. Do I have that right? It's in the brief, Your Honor. I'm forgetting exactly on the specific width. At page 4 of Judge Martone's order, it says, removing dead trees within 500 feet of the boundaries of administrative sites. That's the administrative sites. That's not roads. There's a separate width for roads. Okay. I think it's 100 to 200, depending on whether it was a highway or a Forest Service road. It's in our brief. Forest Conservation Council today, at oral argument and for the first time really in the briefing, has started to say that those widths and the determination of the appropriate widths was inappropriate by the Forest Service to select those widths. There was never really, in the briefing up to this point, a suggestion that the Forest Service didn't correctly analyze what the appropriate width was in order to protect those roads, those utility lines, from the dangers of falling hazard trees. How long did it take the Service to do the environmental assessment on the WUE? The six months that the Court allocated. And it was done within a period of time? It was done in the six-month period, yes. Could an EA have been done on the other two segments in that same period of time? Yes, Your Honor, presumably. What the Forest Service did was comply specifically with what the district court directed. The environmental considerations addressed in the EPA that was done within that six-month period of time, did it address concerns that would have been materially different if all three of these decisions had been done at the same time? In other words, if you'd done an EA on all three segments? With respect to cumulative impacts, the EA addressed all three together, and that's a point I want to get to with respect to this mootness question. There potentially are individual effects with respect to the projects. But it would have taken the same amount of time. That's the answer that you gave, right? Yes, Your Honor, but what we're talking about now is the period after the district court ruled that the two hazard tree projects were appropriately considered under categorical exclusions, but the third wasn't. And so at that point, what the Forest Service did was to go and do the environmental assessment for the wildland urban interface project. My question was just simply, if you had lost on all three in front of Judge Martone and you had to do an EA on all three segments, is your best judgment it would have taken a lot longer, the same amount of time? You don't know? It may have taken a little bit longer, probably could have gotten it done. Addressed the same concerns, though. With respect to cumulative impacts, yes. Same thing. There would have been some individually significant considerations that would have been addressed, you know, with the other projects that were not addressed necessarily with respect to the WI project. You also have the issue of whether an EA is enough or the EIS. Not in this case. Excuse me? Not in this case, Your Honor. This case would not have been an issue. You don't think? It was not an issue presented in this case, and I think the counsel for the plaintiffs conceded that in his opening presentation, that that issue, whether an EIS or an EA was required, wasn't here. What this case was about was the threshold determination. What would have happened if they had gone back and done, instead of relying on the categorical exclusions, they would have gone back and done an environmental assessment as to the fences and roads and as to the two remaining projects. And I guess if you'd done an EA, you'd be facing the question of whether an EA was enough. Well, if they had challenged that. But that's the critical point with respect to mootness. We went back. We did the environmental assessment. The environmental assessment considered these issues about whether it should have been a whole project, you know, treated as one project or three projects. They determined that there were no cumulatively significant effects. That has not been challenged. That is not before this court. What is before this court is simply the threshold determination as to whether the categorical reliance on the categorical exclusions was appropriate. And we would submit it would be inappropriate for this court on the more limited administrative record to go off and reach as to whether the Forest Service acted appropriately on the more expansive administrative record that was created in the EA process, where they took a hard look at this issue of cumulative effects and other things. The point is, with respect to categorical exclusions, when you use those, you determine whether something fits in a category. And then you don't do the broader, you know, hard look under NEPA with respect to the other categories. So if this court were to determine that the categorical exclusions was wrong, what the court would order is just the next step. You go on and you take that hard look. Are there cumulative effects? Do these need to be studied as one project, et cetera? The Forest Service has now done that with respect to the wildland-urban interface, has determined that there are no cumulatively significant effects. That has not been challenged. And so with respect to that project, there really is no relief that this court can grant. Obviously, there is cutting ongoing, but the ongoing operations are pursuant to the new administrative determination. And I have gotten to the eight minutes I wanted to. Your co-counsel is not modest. Most of the time they just sit there and suffer, but not this lady. Thank you, Your Honor. You've been cut down. May it please the Court, my name is Julie Wise, and I represent the intervener appellees, Navajo County, Apache County, the City of Winslow, the Show Low Fire District, and those are all in Arizona, Your Honors, along with the American Forest Resource Council, two of whose members purchased timber sales at issue in this case. Pleased to know that Winslow is still in Arizona. Yes, Your Honor. As counsel for the government indicated, the district court determined that the Forest Service had, in fact, improperly allowed the salvage of dead trees in the wildland-urban interface, the so-called safety zone, a half-mile safety zone in the wildland-urban interface. Rather than enjoining the project from proceeding, however, the district court allowed the project to proceed with a simultaneous preparation of either an EA or an EIS. It didn't direct the Forest Service what to do. In so doing, the district court did not abuse its discretion. The district court properly recognized that an injunction does not inexorably result from violation of an environmental statute, and it also recognized that the equities favored allowing the project to continue and that the public interest favored allowing the project to continue. Now, before I address the district court's denial of an injunction in this case, I would like to join in the government's argument that this particular issue, the challenge to the wildland-urban interface project, is, in fact, moot. The claim that was raised by Forest Conservation Council at the district court level was always to process. In fact, counsel's first word up here was this was about NEPA process, and, in fact, the process was the alleged lack of preparation of an environmental document. Subsequently, the government did, in fact, prepare an EA. The process has now issued. As a result, there is no remedy that this Court can issue. This is not a challenge about the broader, the sufficiency of the EA, either in terms of its contents or its conclusions. But why didn't they do that right at the start? Your Honor, they didn't do that right at the start because they reasonably believed that the project fit within a categorical exclusion. All right. Give me a good example of how each of these projects fitted within categorical exclusion. I'm sorry, Your Honor. You would like an example of how they fit? Yeah, each one. Sure. Well, as for the wildland-urban interface project, Your Honor, the Forest Service felt that removing the categorical exclusion was for timber stand and or wildlife improvement projects. And the Forest Service felt as though it was appropriate to remove dead trees in the wildland-urban interface to accomplish that goal, to accomplish timber stand and or wildlife improvement projects. And, Your Honor, the determination that a project fits within a categorical exclusion. Well, I mean, this is talking about thinning or brush control to improve growth or to reduce fire hazard, the opening of an existing road to a dense timber stand and prescribed burning. Isn't that about what it covers? Yes, Your Honor. How does what was done fit into that? Thinning, brush control? Reasonably, Your Honor, it could. The Forest Service felt that it did fit within that. However, it's moot because the district court determined that. I don't care whether it's moot or not. I just want to know what the justification was. The justification, Your Honor, was, in fact, that the thinning, the removal of trees in the wildland-urban interface would accomplish those goals that fit within that categorical exclusion. The district court, however, disagreed. The district court determined that it could not fit this particular project in that categorical exclusion. And so it determined that an EA needed to be prepared or an EIS needed to be prepared. Okay. How about the roads and trails component? Well, Your Honor, for the roads and trails component, that allows the treatment of dead trees within or adjacent to administrative sites, roads, trails, developed recreation sites, and concentrated use areas. Well, what examples do they give here? Mowing lawns, replacing roofs, painting buildings, applying pesticides, resurfacing roads, grading a road, pruning vegetation, posting landline boundaries, applying herbicides to control poison ivy, applying insecticides at recreation sites, repaving a parking lot, and applying pesticides for rodent or vegetation control. So how does removal of trees on 14,951 acres fit into mowing lawns, replacing roofs, and all that? First of all, Your Honor, the examples are illustrative. They are not exhaustive. Yeah, okay. I suppose. Why doesn't pruning cover it? Why does it have to be illustrative? Your Honor, that's exactly right. It wasn't really exactly painting houses or using herbicides, but pruning fits pretty well, doesn't it? That's right, Your Honor. Pruning does cover it. The removal. You mean when you prune, you cut a whole tree down? It can, Your Honor, yes. Really? You know, I've got 75 trees. Your Honor. Two trees, and I don't do that. I just take a third of the branches off, you know. You should. You know, if I need to take the whole tree down, I just leave it for the gophers, you know. I'll send you some. But, okay, so. The removal of hazard trees has always been recognized as a portion of road maintenance. We look at these rules, don't we? Yes, we do, Your Honor, and we defer to the agency's interpretation. Pruning. Okay, so they're pruning. All right. And, Your Honor, as to. . . How about poison ivy control? Does that come in there, too? Your Honor, again, these examples are illustrative. There's no way that the agency could list all of the activities. And, Your Honor. . . You know, dead trees. Your Honor, road maintenance encompasses the removal of dead trees that are going to pose a risk to the life safety of individuals who are using roads, trails, administrative sites. Not only public safety, but also the safety of the administrative personnel who are working these sites. And Your Honor commented on the number of acres, but there is no mention of scope in these categorical exclusions. And, in fact, the only reason that we have a lot of acres here is because this fire was the largest fire in the recorded history of Arizona. This is not a situation where you have a road that just winds around and around on itself. Back to 1943? Your Honor, I'm not sure when that would be. If perhaps the removal of trees was all within a tiny area of the forest, we might have to take a harder look at the agency's use of the CEs. However, this is a case where the removal of hazard trees, dead trees that were going to fall on roads, trails, administrative sites, concentrated use areas, was spread throughout what was formerly two forests. This is a large area. It is spread over a large area because the forest burned over a large area with a massive fire. Your Honor. . . How about the fences and utility lines? Three thousand eight acres that has to do with resurfacing roads, grading a road, pruning, posting, landline boundaries, replacing underground cable, trunk, or reconstructing a power line? Yes, Your Honor. Falls into that? Your Honor, it fits within that category. The Forest Service determined that it did, and the district court deferred to that interpretation because these trees were at risk of falling on the utility lines, and it made sense to actually remove them before they could fall on the utility lines. It does fit within the CE. The district court deferred to that. And this Court should uphold the district court's determination in its entirety, Your Honors. I see that I'm out of time. May I briefly conclude? I mean, you want to quit now? Is that what you're saying? I'm happy to go, Your Honor. I would urge this Court to uphold the district court's determination in its entirety. The district court properly determined that the agency had not acted in an arbitrary and capricious fashion when it authorized the removal of dead trees, Your Honors, no-growth trees, dead trees pursuant to categorical exclusions, and the district court did not err when it allowed the project to continue, even though it found a violation of NEPA. Thank you. Even though what? Even though it found a violation of NEPA for the Wildland Urban Interface Project. Oh, yeah. Found a violation of NEPA. Yes. All right. Did you get an EIS for those prunings you did? Yeah. This Court reviews the district court's determinations both on the merits issues and the remedial issues. Yes, Kaczynski wants to know, I asked the Governor, do I need an EIS when I prune my trees? You know, I mean, I'm in a fire-hazardous area, dry grass, and I cut it all down. You know, that might be a good excuse for me not to have an EIS. No EIS. Because there's no EIS. This Court's going to apply a de novo review to Judge Martone's findings here, and FCC respectfully submits that on de novo review that the district court's determinations on both the merits issues and the remedial issues should be reversed. I'll be extremely brief. With respect to the government's suggestion of mootness, I urge the Court to review its earlier decision of Blue Mountains Biodiversity Project versus the United States Forest Service, which is virtually identical to this case in the Blue Mountains Biodiversity Project. Except it didn't involve categorical exclusions. Exactly. It was a much — it wasn't so egregious as this case. In that case, what the forest — what this Court determined — So you would argue it was identical, even argue it was different. This case is more — I was giving the government the benefit of the doubt, Your Honor. This case is far more egregious, because at least in Blue Mountains Biodiversity Project, the Forest Service had taken the time to prepare an EA. Here they didn't even go that far. This is one project. That project was conceived of as one project. It was planned as one project. There's one administrative record for the project. Many of the — That's because he had a question there. I'm sorry, Your Honor. But they take the position that they don't need to because it falls with a categorical exclusion, whereas Blue Mountain was a case where they, in fact, did need to do an assessment, or maybe an EIS. So the cases are distinguishable, and you don't have to persuade me that this case is worse. On the legal issue, Your Honor, I disagree with you. On the legal issue, which is the appropriate scope of the NEPA document that should have been prepared in the first instance, the cases are exactly the same, and that is, in both cases, the Forest Service was concurrently planning a number of projects in one fire area. The projects had been announced concurrently. The resource analyses were concurrent. In this case, even the timber sale operators are implementing it. But the difference is that if it falls within the categorical exclusion, it's really not covered, whereas if you are not covered by exclusion, you have to do either an EA or an EIS. So just determining that something is out of the requirement where you need either an EA or an EIS strikes me as a different determination than deciding which kind of assessment you need.  And, Your Honor, the way that the Forest Service tried to shoehorn itself into the categorical exclusion box here was by dividing what was one project into multiple projects. In fact, in the administrative record, and we've cited this in our briefs, the Forest Service admits that the reason that they divided this project into multiple projects is because they didn't want to put all of their eggs in one basket, and they knew that they would be vulnerable to a reversal of their decision by this Court. They have been very candid with respect to the fact that they divided this project specifically to avoid that result. Were it not for the division of the project into three parts, they really wouldn't have a leg to stand on. We submit that they don't in any event. Okay. Your time is up. We even gave you a little extra. Thank you, Your Honor. All right. Thank you. The matter will stand submitted, and the Court for this session will adjourn, and we will return tomorrow morning at 9 o'clock. Thank you. This Court in this session is adjourned.
judges: Pregerson, Kozinski, Hawkins